UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

WAYNE DUBOIS,

     Plaintiff,

       v.

VERSO CORPORATION,

     Defendant.

Civil Action No.

## COMPLAINT
## JURY TRIAL REQUESTED
## INJUNCTIVE RELIEF REQUESTED

Plaintiff, Wayne DuBois, by and through undersigned counsel, complains against

Defendant, Verso Corporation, as follows:

### INTRODUCTION

1.     This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551

*et seq.* and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*

### PARTIES

2.     DuBois is a United States citizen residing in Augusta, Maine.

3.     Verso Corporation ("Verso") is a Delaware corporation that operates a number of

mills including the Androscoggin Mill in Jay, Maine.

### JURISDICTION

4.     Verso had 15 or more employees for each working day in each of 20 or more

calendar weeks in the same calendar year as when the alleged discrimination occurred.

5.     Verso employs more than 1,500 employees including over 800 at the Androscoggin

Mill.

6.      This Court has subject matter jurisdiction over DuBois's federal and state claims pursuant to 28 U.S.C. §§ 1331 and 1367.

7.      On November 10, 2014, DuBois filed a timely Complaint of Discrimination against Verso alleging unlawful disability discrimination with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

8.      On or about November 16, 2015, the MHRC issued a Notice of Right to Sue with respect to DuBois's state law claims.

9.      On or about November 16, 2015, the EEOC issued a Notice of Right to Sue with respect to DuBois's federal law claims.

10.     DuBois has exhausted his administrative remedies with respect to all claims set forth in this Complaint.

## FACTUAL ALLEGATIONS

11.     DuBois has been employed at the Androscoggin Mill for 34 years, first by International Paper and now by Verso.

12.     DuBois has been a Pulp Mill Operator ("PMO") since January 1, 2006.

13.     PMOs lead a crew of Service Operators.

14.     The PMO's roles and responsibilities were spelled out in a Pulp Mill Operator posting in October 2009. The essential functions of the job are managing people and production in a safe environment. The PMO's primary duties are administrative and troubleshooting. Fully three quarters of the PMO job does not involve any medium or heavy physical labor.

15.     DuBois's right shoulder had been giving him problems for quite some time prior to the spring of 2014.

16.     DuBois had difficulty lifting and moving his right arm without pain and was having trouble sleeping because of the pain.

17.     In spite of DuBois's shoulder impairment, he was qualified and continued to perform his job duties as PMO until late April 2014 at which time DuBois and his doctor agreed that it was time for him to have his right shoulder replaced.

18.     DuBois's last day of work before surgery was April 21, 2014.

19.     DuBois requested and received permission from Verso for a medical leave of absence beginning on April 22, 2014.

20.     DuBois had surgery on April 23, 2014.

21.     Without surgery, DuBois would be substantially limited in his ability to sleep and use his right upper extremity.

22.     On July 17, 2014, DuBois's surgeon released him to return to work as a PMO on August 25, 2014 with a permanent restriction of lifting no more than 15 pounds with his right shoulder.

23.     DuBois had no lifting restriction on his left arm or otherwise.

24.     DuBois provided his doctor's note to Verso.

25.     As of August 25, 2014, DuBois was ready and able to return to his PMO position without accommodation.

26.     A few days before August 25, 2014, DuBois was told not to report to work.

27.     On September 3, 2014, DuBois was notified by letter that Verso was unable to accommodate his lifting restriction because "turning valves" is an essential function of his job.

28.     DuBois asked for a meeting to discuss his return to work.

3

29.     On September 9, 2014, Verso prepared a Job Requirements list for the PMO position. That document did not exist when the decision was made to deny DuBois's request to return to work on August 25, 2014.

30.     The Job Requirement list does not accurately reflect the physical requirements of the job.

31.     On September 17, 2014, the company doctor (Dr. Michael Rowland) toured the Mill with Area Manager J.C. Smith and another PMO (Ron Goodhart), not DuBois.  Goodhart had no knowledge of how DuBois performs the PMO job.

32.     On October 1, 2014, DuBois met with Smith, Human Resources generalist Darlene Marstaller, and Dr. Rowland.

33.     DuBois brought the following prepared statement to the October 1, 2014 meeting and read it out loud:

> "I have received a letter from the head of the Pulp department stating his position regarding my return to work. I have taken time to consider and to try to understand the perspective that a restriction of 15 pounds on one arm would interfere with the ability of a person to turn a valve. I'd like to share an alternate view, one that highlights how I can continue to perform this and all other essential functions of the Pulp Mill Operator position I have performed successfully for 10 years safely without placing myself or others at risk or in danger.

> "I had lost my right eye as a child. Through this unfortunate event I learned the ability to adapt; a skill that continues to serve me well. An example of a physical adaptation I have made to accomplish a goal was to learn to shoot a rifle left handed, even though I am naturally right handed.

> "I am able to utilize this same principle to the restriction placed on my right arm. I am able to apply the undiminished power of my left arm, along with that of my right arm to continue to accomplish necessary tasks. This includes being able to supply the force necessary to operate some valves. Other valves by virtue of their design (auto air assisted or ball quarter-turn for example) and still more by virtue of their size and condition aren't an issue. On most days, the Pulp Mill Operator does not operate valves; and there aren't any valves tasks to the position of PMO. In assisting the service operator, I can operate the panel while the operator turns the valves he is responsible for.

"There will be some valves I won't try to operate alone. This is not related to any conditions. Rather, it is implementing a safety-first approach to my job. Valves in the pulp mill come in multiple types, sizes and conditions. It is expected safe practice within the department to accomplish the operation of valves, such as the 'B' flash steam condenser mill water valves, by several people working together.

"Verso Paper encourages team work and collaboration, working together to achieve the goals of the department and for the company. I possess the knowledge, skills and abilities needed to effectively continue to be a Pulp Mill Operator and continue to be an asset to the pulp mill team."

34.     DuBois also offered to demonstrate his ability to turn valves. His offer was rejected.

35.     After meeting with DuBois in person on October 1, 2015, Verso added more items to the list of duties that they alleged he could not perform. In addition to turning valves, Verso alleged that DuBois was unable to don a Scott Air Pack (this objection was later withdrawn), climb ladders, operate water hoses, use the headache ball to clear chips from silos, or enter confined spaces.

36.     Some of Verso's claims about DuBois's abilities were false. DuBois could and can turn valves, climb ladders, and operate water hoses.

37.     Some of Verso's claims about DuBois's abilities were irrelevant. Entering confined spaces and using the headache ball are not essential functions of the PMO position.

38.     In November 2014, DuBois filed a complaint of disability discrimination against Verso with the MHRC and EEOC.

39.     The MHRC notified Verso of DuBois's complaint in February 2015.

40.     From August 2014 to March 2015, DuBois expressed interest in returning to work at the Mill in any capacity but Verso refused to reassign DuBois to open, vacant positions for which DuBois was qualified.

41.     In fact, from August 2014 to March 2015, Marstaller told DuBois many times that his employment would be terminated in April 2015 if his 15 pound right arm lifting restriction was not lifted.

42.     Before DuBois filed a complaint of disability discrimination with the MHRC and EEOC, the only avenue that Verso made available for DuBois to return to work was to apply for open positions in the Mill on a competitive basis with other applicants.

43.     DuBois applied for some jobs and was not considered.

44.     DuBois applied for other jobs and was interviewed but not selected.

45.     When the MHRC notified Verso of DuBois's complaint of disability discrimination in February 2015, the MHRC extended an offer to both parties to engage in mediation. DuBois accepted the offer. Verso declined.

46.     On about March 6, 2015, Verso offered DuBois a Scaler job.

47.     DuBois accepted the offer and returned to work on March 16, 2015.

48.     The Scaler position had been open since Larry Blumquest retired on February 28, 2014, before DuBois took medical leave for surgery in April 2014 and long before DuBois was ready to return to work in August 2014.

49.     Verso would not have offered DuBois the Scaler position if he had not filed a complaint of disability discrimination.

50.     DuBois had a routine follow-up examination with his orthopedist on April 14, 2015. During that visit, the doctor re-wrote DuBois's permanent work restriction. Instead of expressing his restriction as "® shoulder no lifting >15 lbs," the doctor wrote, "Mr. DuBois capable of performing the duties of pulp mill operator. He is allowed to lift 40 lbs when using both hands. There are no other current restrictions."

51.     DuBois still had, and has, a 15-pound right arm lifting restriction, the same restriction he had when Verso refused to allow him to return to work as a PMO in August 2014.

52.     DuBois provided the updated note to Verso.

53.     On April 22, 2015, Dr. Rowland cleared DuBois for the PMO position.

54.     DuBois was allowed to return to his PMO job on April 24, 2015.

55.     Since he returned to work as a PMO, DuBois has performed the essential functions of the PMO job without accommodations from Verso.

56.     DuBois copes with his right shoulder impairment by using strategies commonly used by employees who are not physically robust or disabled, e.g., using a "cheater" (a valve handle wrench that acts as a force multiplier) or by using both hands for tasks that others may perform with one hand only.

57.     DuBois copes with his right shoulder impairment by using the same strategies he used prior to having surgery on his right shoulder in April 2014 when his right shoulder was far more impaired.

58.     DuBois has a physical impairment that substantially limits one or more major life activity in the absence of mitigating measures e.g. surgery.

59.     DuBois has a physical impairment that significantly impairs his physical health in the absence of mitigating measures e.g. surgery.

60.     DuBois has a record of disability.

61.     DuBois is regarded by Verso as having or likely to develop a disability.

62.     DuBois is able to perform the essential functions of the PMO position with reasonable accommodation (a medical leave of absence) and without reasonable accommodation (prior to April 22, 2014 and since August 25, 2014).

63.     DuBois's job performance as PMO was at all times satisfactory.

64.     Verso violated DuBois's rights under the MHRA and ADA by repeatedly threatening to terminate his employment if his work restriction was not lifted by April 2015.

65.     Verso violated DuBois's rights under the MHRA and ADA by excluding DuBois from employment entirely from August 25, 2014 until March 16, 2015 due to disability discrimination.

66.     Verso violated DuBois's rights under the MHRA and ADA by excluding DuBois from his job as PMO from August 25, 2014 until April 24, 2015 due to disability discrimination.

67.     Verso's sole reason for excluding DuBois from work entirely for a full seven months and from his PMO position for eight months is due to disability discrimination.

68.     Verso reversed course and reinstated DuBois solely because DuBois filed a disability discrimination complaint against Verso with the MHRC and EEOC.

69.     Verso has not and cannot show that from August 25, 2014 to April 24, 2015, DuBois was unable to perform the duties of the PMO position or unable to perform the duties of the PMO position in a manner that would not endanger the health or safety of the individual or others.

70.     Verso's exclusion of DuBois from work was not based on an individualized assessment of the relationship between DuBois's physical disability and the specific legitimate requirements of the job.

71.     When Verso told DuBois that he could not return to work because of his 15 pound right arm lifting restriction, DuBois offered to demonstrate to Verso how he was able to perform his job duties, but Verso refused.

72.     Verso did not have a factual basis to believe that, to a reasonable probability, DuBois's physical disability rendered him unable to perform the duties of PMO or to perform them in a manner that would not endanger the health or safety of DuBois or others.

73.     Verso excluded DuBois from work on the mere possibility that his physical disability might endanger someone's health or safety.

74.     Verso excluded DuBois from work because of unfounded fears and stereotypes about employing a person with a permanent physical impairment.

COUNT I: MHRA

75.     Paragraphs 1-74 are incorporated by reference.

76.     Verso's conduct violated the MHRA.

COUNT II: ADA

77.     Paragraphs 1-76 are incorporated by reference.

78.     Verso's conduct violated the ADA.

PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

(a)     Declare the conduct engaged in by Defendant to be in violation of his rights;

(b)     Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

(d)     Award equitable-relief for back pay, benefits and prejudgment interest;

(e)     Award compensatory damages in an amount to be determined at trial;

(f)     Award punitive damages in an amount to be determined at trial;

(g)     Award liquidated damages in an amount to be determined at trial;

(h)     Award nominal damages;

(i)      Award attorney's fees, including legal expenses, and costs;

(j)      Award prejudgment interest;

(k)      Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability;

(l)      Require Defendant to mail a letter to all employees at the Androscoggin Mill notifying them of the verdict against them and stating that Defendant will not tolerate discrimination in the future;

(m)      Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

(n)      Require that Defendant train all management level employees on the protections afforded by the MHRA and ADA;

(o)      Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully excluded him from employment due to disability discrimination; and

(p)      Grant to Plaintiff such other and further relief as may be just and proper.


Dated:  December 1, 2015                              /s/ Chad T. Hansen
                                                     chansen@maineemployeerights.com

                                                     /s/ Peter Thompson
                                                     pthompson@maineemployeerights.com

                                                     Attorneys for Plaintiff
                                                     MAINE EMPLOYEE RIGHTS GROUP
                                                     92 Exchange Street 2nd floor
                                                     Portland, Maine 04101
                                                     Tel. (207) 874-0905
                                                     Fax (207) 874-0343